IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERI GREEN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 14 C 4095 |
| ) | |
| SUN LIFE ASSURANCE COMPANY, ) | Judge John Z. Lee |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Cheri Green seeks judicial review of Sun Life Assurance Company's ("Sun Life") denial of long term disability benefits, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The parties have cross moved for summary judgment. For the reasons provided herein, the Court grants in part and denies in part Green and Sun Life's motions and remands the case to the plan administrator.

### Facts[1]

Green was formerly employed by Daiichi Sankyo, Inc. as a Pharmaceutical Representative from June 18, 2007, until January 10, 2012. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 1, 7; Def.'s LR 56.1(a)(3) Stmt. ¶ 9. Both parties treat January 11, 2012, as the date of Green's disability. Pl.'s LR 56.1(a)(3) Stmt. ¶ 10.

At that time, she was being treated for occipital neuralgia and neck pain, as well as depression and anxiety. A.R. 578–79. Green filed a claim with Daiichi Sankyo's long term disability plan, which was funded and administered by Sun Life. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 3–5, 9.

---

[1] Unless otherwise noted, the facts are undisputed.

In order to qualify for benefits under the long term disability plan, a claimant must be continuously unable to perform the essential tasks, functions, skills, or responsibilities of her occupation as it is generally recognized in the national economy during the first 180 days of disability and the next twenty-four months.[2] *Id.* ¶¶ 6–7. The plan defines "own occupation" as "the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy." A.R. 111.

It is undisputed that Green's major duties as a Daiichi Sankyo Inc. Pharmaceutical Representative were:

(1) to "make clear, concise persuasive presentations to key physicians,"
(2) to "personally visit[] offices and influenc[e] physicians and healthcare providers to prescribe Daiichi Sankyo promoted products,"
(3) to "[t]ravel . . . 40% of time,"
(4) to "[o]perate a company vehicle,"
(5) to "transport[] materials (samples, visual aids, audiovisual and other electronic equipment) up to 25 pounds into a physician's office," and
(6) "[o]n occasion, . . . to lift weights in excess of 30 lbs."

Pl.'s LR 56.1(a)(3) Stmt. ¶ 6. Sun Life's Maria Lekarcyzk, M.Ed., CRC, categorized Green's occupation under the Dictionary of Occupational Titles (DOT) as a pharmaceutical sales representative, code 262.157-010, which requires light work.[3]  A.R. 17–18, 574, 1245.

---

[2] The plan also provides that "[a]fter Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified by education, training or experience." *Id.* ¶ 6.

[3] Green asserts that her Daiichi Sankyo job description entailed "medium work," rather than "light work," as that term is defined by the DOT. Green does not claim that Sun Life chose the wrong DOT definition or that a different DOT definition more accurately describes her job. Nor does she argue that another collection of occupational information more accurately depicts her job as it is generally recognized in the national economy. The plan language permits Sun Life to rely on collected data such as the DOT. *See* A.R. 111. And Green has not shown, beyond the single instance of her own job description, that the DOT's description does not reflect Green's occupation as it is normally performed in the general labor market in the national economy.

According to the DOT, Green's occupation involved meeting with physicians in their offices to promote pharmaceutical products and inform physicians of new drugs. A.R. 17–18.

In support of her disability claim, Green submitted her treating physicians' medical records, including, but not limited to, those from Dr. William Crevier, an internist; Dr. Kevin Fagan, a neurologist; Dr. Sylvia Butler, a psychologist; and Dr. Monica Moore, a gynecologist. *See* Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 8–9, 12–14, 17–19, 21–23, 26; A.R. 174–77, 246–48, 401–08, 450–53, 497–513, 559–61, 827–50.

In late 2011 and early 2012, Dr. Crevier noted that Green was experiencing pelvic pain, low back pain, neck pain, and headaches. A.R. 404. He again noted that Green continued to experience neck pain in June 2012. A.R. 401. Dr. Crevier treated Green for migraines and chronic back pain and referred her to Dr. Fagan for treatment of her headaches and cervical radiculopathy. A.R. 403–06.

On January 6, 2012, Dr. Fagan diagnosed Green with occipital neuralgia triggered by her posture, her stress, and possibly her visual problems. Pl.'s LR 56.1(a)(3) Stmt. ¶ 8; A.R. 177. Dr. Fagan prescribed physical therapy and the medication Elavil to alleviate Green's nerve pain that radiated up the back of her head. Pl.'s LR 56.1(a)(3) Stmt. ¶ 8; A.R. 177. He continued to treat Green's pain in February and March 2012. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 12–13. He observed at that time that the Elavil did not relieve the pain that radiated down Green's left arm and that the drug's the side effects were disturbing her. *Id.* ¶ 13. In August 2012, Dr. Fagan stated that Green continued to have occipital neuralgia and cervical radiculopathy. *Id.* ¶ 34. Dr. Fagan further indicated that Green's biggest problems were anxiety and depression. *Id.* ¶ 8; A.R. 176.

On January 11, 2012, Dr. Butler diagnosed Green with anxiety and mood disorder not otherwise specified. A.R. 497. The doctor concluded that Green displayed, among other things, a distorted view of reality, poor judgment, deficits in communication skills, fleeting eye contact, homicidal preoccupations, slowed motor activity, and neglected grooming. Pl.'s LR 56.1(a)(3) Stmt. ¶ 29; A.R. 492–93. On January 13, 2012, Butler reported that Green lacked personal grooming and hygiene, had been wearing the same clothes for two weeks, and displayed difficulty focusing and concentrating. Pl.'s LR 56.1(a)(3) Stmt. ¶ 29; A.R. 497.

Green continued to see Dr. Butler twice a week for five weeks, and once per week thereafter, with very few exceptions. A.R. 497–513. On February 13, 2012, Dr. Butler diagnosed Green with major depressive order and prescribed a regimen of psychotropic medications to treat her anxiety and depression. A.R. 506. Dr. Butler reported on March 2, 2012, that Green was hallucinating and noted that Green may be experiencing psychosis from her medications. Pl.'s LR 56.1(a)(3) Stmt. ¶ 29; A.R. 508. On March 16, 2012, Dr. Butler indicated that Green's medications had been modified and concluded that Green was not ready to return to her regular job for three to four weeks. A.R. 508. In a letter to Green's employer, dated April 9, 2012, Dr. Butler concluded that Green would be able to return to work on April 16, 2012. A.R. 509.

During this same period of time, on March 9, 2012, Dr. Monica Moore treated Green for abdominal pain. *See* A.R. 246. On April 5, 2012, to determine what was causing her abdominal pain, Green underwent operative laparoscopy during which her vaginal fornix was accidentally perforated by a surgical instrument. Pl.'s LR 56.1(a)(3) Stmt. ¶ 16; *see* A.R. 246, 508, 641, 644. The laparoscopy revealed uterine fibroids and scarring around Green's ovaries. A.R. 443. During the weeks following the laparoscopy, Dr. Moore treated Green for post-operative pain

and post-traumatic wound infection. Pl.'s LR 56.1(a)(3) Stmt. ¶ 17; A.R. 438, 648. A week after the laparoscopy, Green underwent a CT scan of her abdomen and pelvis. Pl.'s LR 56.1(a)(3) Stmt. ¶ 18. Then, on May 8, 2012, Dr. Moore performed a total abdominal hysterectomy after which Green was hospitalized through May 11, 2012. A.R. 248. Dr. Moore stated that, even as of May 25, 2012, Green still had a negligible capacity to drive, walk, sit, and lift up to 5 pounds, and that she could not perform even sedentary work until August 1, 2012. A.R. 247–48.

In August 2012, Dr. Crevier observed that Green suffered from worsening pelvic pain, as well as a urinary tract infection, cervical radiculopathy, and chronic low back pain. A.R. 841. Green was prescribed Celebrex, Ibuprofen, and Norco. A.R. 841.

Sun Life denied Green's claim for long term disability benefits on September 5, 2012. Pl.'s LR 56.1(a)(3) Stmt. ¶ 36. Sun Life stated that, although Green had successfully established that she was unable to sustain a light level of activity from April 2012 to June 15, 2015, she failed to establish that her physical or psychological conditions would have precluded her from performing a light level of activity from January 11, 2012, to early April 2012, or from June 15, 2012, to July 8, 2012. *Id.* Thus, according to Sun Life, Green was not continuously disabled during the 180-day Elimination Period.

Green appealed the denial. A.R. 601. In support of her appeal, she submitted letters from family members and friends,[4] as well as additional documents. Pl.'s LR 56.1(a)(3) Stmt. ¶ 46.

On December 22, 2012, the Social Security Administration (SSA) issued its determination that Green became disabled under the SSA's rules on January 11, 2012. Pl.'s LR

---

[4] Although Green asserts that Sun Life never reviewed these letters, the record refutes that assertion. *See* A.R. 1195–96 (stating that collateral letters were reviewed on appeal).

56.1(a)(3) Stmt. ¶ 61; A.R. 1231. The SSA notified Green that she was eligible for monthly benefits for the period beginning in July 2012. Pl.'s LR 56.1(a)(3) Stmt. ¶ 61; A.R. 1231.

In January 2013, Sun Life requested and received additional documents from Green's attorney, Josh Rudolphi, regarding her workers' compensation claim. A.R. 889. In addition, in February 2013, Sun Life requested and received additional employment records from Daiichi Sankyo, Inc. *Id.*

On February 21, 2013, Sun Life requested that Green provide a copy of the SSA determination as well as an October 22, 2012, psychiatric report prepared by consultative examiner Dr. Robert Neufeld. Pl.'s LR 56.1(a)(3) Stmt. ¶ 59. On February 26, 2013, Green's attorney submitted Dr. Neufeld's report and the SSA notice of award, but he omitted the SSA determination. Pl.'s LR 56.1(a)(3) Stmt. ¶ 60; A.R. 1231–34. Green's attorney stated "please contact me immediately if you require further information." A.R. 1228.

Without requesting the SSA claim file or contacting Green's attorney to obtain the SSA determination, on March 18, 2013, Sun Life denied Green's appeal. Pl.'s LR 56.1(a)(3) Stmt. ¶ 64. In denying Green's appeal, Sun Life stated: "while a copy of the Social Security disability income claim file has not been made available to us, the information utilized in making this own occupation claim appeal determination[] took into consideration the medical and vocational information made available to us, and the terms and the provisions of the LTD policy." *Id.* Sun Life ultimately concluded that, contrary to its initial decision finding that Green's psychiatric impairments were not disabling, Green was totally disabled due to her depression and anxiety from January 11 through March 2, 2012. A.R. 1261. However, Sun Life concluded that from March 3 through April 4, 2012, and from July 9, 2012, to present, Green was able to perform her own occupation as well as several others in the national economy. A.R. 1261.

6

**Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, a court views the record in the light most favorable to the losing party and draws all reasonable inferences in that party's favor. *Jones v. C&D Techs., Inc.*, 684 F.3d 673, 676 (7th Cir. 2012).

Where, as here, an ERISA plan gives the plan administrator discretionary authority to interpret the plan's terms and determine eligibility, the court reviews a denial of benefits under an arbitrary and capricious standard.[5] *See Tompkins v. Cent. Laborers' Pension Fund*, 712 F.3d 995, 999 (7th Cir. 2013); Def.'s LR 56.1(a)(3) ¶ 8. When determining whether a decision to deny benefits was arbitrary and capricious, "we look to whether specific reasons for denial [were] communicated to the claimant, whether the claimant [was] afforded an opportunity for full and fair review by the administrator, and whether there is an absence of reasoning to support the plan's determination." *Leger v. Tribune Co. Long Term Disability Benefit Plan*, 557 F.3d 823, 832–33 (7th Cir. 2009) (quotations omitted). "Although our review is highly deferential, it 'is not a rubber stamp.'" *Cerentano v. UMWA Health & Retirement Funds*, 735 F.3d 976, 981 (7th Cir. 2013) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)).

When a benefits plan vests discretionary authority in an administrator that both evaluates claims and pays out benefits, it presents a structural conflict of interest that "must be weighed as a 'factor in determining whether there is an abuse of discretion.'" *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

---

[5] While some courts refer to the deferential standard of review under ERISA as an "abuse of discretion standard," the Seventh Circuit describes it as an "arbitrary and capricious standard." *See Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003). "[T]his appears to be a distinction without a difference." *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 815 n.4 (7th Cir. 2002).

(1989)). Under *Glenn*, a court may use a structural conflict of interest "to break a tie in a close case 'where circumstances suggest a higher likelihood that it affected the benefits decision.'" *Id.* at 117; *see also Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861–62 (7th Cir. 2009) ("When the case is borderline, . . . the inherent conflict of interest . . . can push it over the edge–towards a finding of capriciousness.").

## **Analysis**

Based on Green's date of disability, the 180-day Elimination Period began on January 11 and ended on July 8, 2012. A.R. 581. To be considered totally disabled, an employee is required to show that, during the Elimination Period, she was continuously unable to perform the material and substantial duties of her own occupation, which is defined as the usual and customary employment that the employee performed as it is generally recognized in the national economy. Pl.'s LR 56.1 Stmt. ¶ 6.

When Sun Life initially denied Green's claim, it stated that Green's medical records established she was precluded from performing her own occupation from early April 2012 to June 15, 2012. A.R. 580. However, according to Sun Life, Green's medical records failed to show that she was totally disabled from January 11, 2012, to early April 2012 or from June 15, 2012, to July 8, 2012, based on either her physical or psychological impairments. A.R. 581. Sun Life therefore concluded that Green was not totally disabled for 180 continuous days during the Elimination Period. A.R. 581.

On appeal, Sun Life modified its conclusions. It determined that Green had been incapable of performing her own occupation from January 11 to March 2, 2012 (based on her psychological impairments) and from April 5 to July 8, 2012 (due to her physical impairments).

8

A.R. 1261. In other words, Sun Life concluded that Green could perform her own occupation from March 3 to April 4, 2012. A.R. 1261.

There is an absence of reasoning in the record to support Sun Life's conclusion on appeal that Green had no restrictions from March 3 through April 4, 2012. Dr. Dean Knudsen, Sun Life's consultative medical records examiner, stated that, as of March 3, 2012, the medical records do not provide adequate third-party observations describing symptoms that would support impairment. A.R. 1256. But this conclusion lacks support in the record.

Dr. Butler's notes from a psychotherapy session on March 2 indicate that Green was experiencing psychosis from her medications and that she was limited in motor activity due to the effects of her medication. A.R. 508. Specifically, Green was seeing spirits and believed her dog could see them as well. A.R. 508. Furthermore, Dr. Butler indicates that on March 2, she made no changes to Green's medication and wanted to "wait one week for changes b4 requiring meds adjustment." A.R. 508. In fact, the first record that indicates Green's medications were changed is dated March 16, 2012. A.R. 508. Dr. Butler's observation of Green's troubling psychiatric condition on March 2 and Green's continued use of the medications until March 16 runs counter to Dr. Knudsen's conclusion that Green had no psychiatric restrictions as of March 3.

Furthermore, Dr. Butler noted on March 9 and March 16, 2012, that Green was still displaying irrational ideations, that she had difficulty restructuring her thoughts of anger, and that it would take another three to four weeks for Green to experience the expected results from her psychotropic medications. A.R. 508. Dr. Butler also indicated on April 3 and April 9, 2012, that Green's depression and anxiety were exacerbated by her inability to walk due to her pelvic

9

pain and her pending surgical laparoscopy on April 5, 2012.[6] A.R. 510. To this end, Dr. Butler wrote a note to Green's employer indicating that she would not be able to return to work until April 16, 2012. A.R. 509.

Sun Life concedes that a pharmaceutical sales representative's primary duty is to meet with physicians in order to promote pharmaceutical products and persuade them to increase prescriptions of promoted products. It is difficult to see how Green could have performed these duties given Dr. Butler's assessment of her psychological impairments from March 2 through April 4, 2012. Dr. Butler's records show that, during this time frame, Green was exhibiting signs of psychosis and expressing irrational thoughts due to her psychotropic medications. Nowhere in its denial of her appeal does Sun Life explain how Green would be able to perform the material and substantial duties of her occupation while exhibiting such aberrant behaviors. *See* A.R. 576.

Furthermore, Sun Life concluded that Green had no restrictions from March 3 through April 4, 2012, without the benefit of reviewing the SSA claim file or the SSA ALJ's determination. Sun Life failed to explain why it decided the appeal without the SSA claim file or the SSA determination. Had Sun Life requested them from Green's attorney, Sun Life's consultative medical records examiners could have fully and fairly reviewed the SSA claim file and the ALJ's rationale to determine whether Green was continuously able to perform as a pharmaceutical sales representative during the Elimination Period and the twenty-four months that followed.

---

[6] In this regard and others, it appears that Sun Life failed to consider whether the combined effects of Green's physical and psychological impairments caused her to be totally disabled. *See Curtis v. Hartford Life & Accident Ins. Co.*, 64 F. Supp. 3d 1198, 1123 (N.D. Ill. 2014) ("[A] disability determination must make a reasoned assessment of whether the total combination of claimant's impairments justify a disability finding, even if no single impairment standing alone would warrant the conclusion" (quotation and citation omitted)).

Moreover, Sun Life does not argue that the ALJ's determination would have been completely irrelevant to Green's appeal. Nor could it. Under the SSA's rules, no benefits would have been awarded to Green unless she could perform no job in the national economy, considering her age, education, and work experience. *See* 42 U.S.C. § 423(d)(2)(A). In addition, under the SSA's rules, the impairment must have lasted or will last for a year or more. 42 U.S.C. § 423(d)(1)(A). Sun Life's failure to explain its reasons for disagreeing with the ALJ's determination renders its denial arbitrary and capricious, particularly given the structural conflict of interest at play here. *See, e.g., Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1087 (7th Cir. 2012) (holding that a plan administrator's failure to provide a claimant with a reasonable explanation for discounting the contrary findings of the SSA, especially when operating under a structural conflict of interest, rendered the denial of benefits arbitrary and capricious).

On another note, Green urges the Court to hold that Sun Life is estopped from arguing that she was not disabled because the SSA concluded otherwise.[7] However, the Seventh Circuit has consistently rejected the argument that a plan administrator is judicially estopped from interpreting the terms of a policy because the SSA found a claimant disabled under the SSA's rules. *See Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007); *see also Raybourne*, 700 F.3d at 1087. To hold otherwise under the facts of this case would essentially make SSA determinations automatically binding on plan administrators, a concept that has been repudiated. *See Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392, 398 (7th Cir. 2009);

---

[7] According to Green, estoppel applies because Sun Life's benefited economically from her arguments during the SSA proceedings since her SSA benefits are deducted from the benefit amount payable under the plan at issue, see A.R. 18. *But see Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) (holding that the doctrine of judicial estoppel is technically inapplicable where the plan administrator is not a party to the SSA proceeding, and even if the spirit of the doctrine were to be applied in these types of cases, it does not provide an independent basis for awarding benefits).

11

*Washington v. Ameritech Sickness & Accident Disability Benefit Plan*, 66 F. App'x 656, 659 (7th Cir. 2003).

Having determined that Sun Life's denial of benefits was arbitrary and capricious, the Court next determines whether to remand for further proceedings or to award benefits outright. "When an ERISA plan administrator's benefits decision has been arbitrary, the most common remedy is a remand for a fresh administrative decision rather than an outright award of benefits . . . ." *Holmstrom*, 615 F.3d at 778. Where benefits were already being paid to the claimant prior to being improperly terminated by the plan administrator, however, the Seventh Circuit has stated that the proper remedy is reinstatement of benefits. *See Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775–76 (7th Cir. 2003). "The distinction focuses on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination." *Id.* at 776. In rare cases, where the record "contains powerfully persuasive evidence that the only determination the plan administrator could reasonably make is that the claimant is disabled," a remand is unnecessary. *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009).

Green seeks a declaratory judgment requiring Sun Life to pay all of the benefits to which she is entitled up to her retirement age. Compl. ¶ 42. She asserts that a remand is unnecessary because it would be unreasonable to deny benefits on any ground.

As discussed above, Sun Life failed to adequately explain why Green was not continuously unable to perform the essential tasks, functions, skills, or responsibilities of her occupation during the 180-day Elimination Period and the subsequent twenty-four months. Although the notice of award of SSA benefits is included in the administrative record, the SSA claim file, the ALJ's determination, and Sun Life's explanation as to why it rejected the SSA

ALJ's determination are not. The record requires further development on all fronts. A remand will enable Sun Life to determine whether the combined effects of Green's physical and psychological impairments, as well as the medications used to treat them, caused her to be totally disabled during the time period in question. After reviewing the SSA claim file and the ALJ's rationale, Sun Life may determine that the SSA got it right. If Sun Life disagrees with the SSA ALJ's rationale and the underlying bases, Sun Life must explain why it reaches a different conclusion. This is not a clear cut case, nor is it a case in which benefits were being paid but then were terminated. Accordingly, the Court holds that a remand is the appropriate remedy here.

## Conclusion

For the reasons provided in this Order, Green's summary judgment motion [36] and Sun Life's cross motion [41] are granted in part and denied in part. Green's motion is granted to the extent that the Court holds that Sun Life's denial of benefits was arbitrary and capricious and denied to the extent that Green requests that the Court order Sun Life to award her benefits and prejudgment interest. Sun Life's motion is granted to the extent that it requests a remand to the plan administrator to properly examine the claim and denied in all other respects. This case is hereby terminated.

**SO ORDERED**                                    **ENTERED   3/7/16**

                                                                                    _____

                                                                                     **John Z. Lee**
                                                                                     **United States District Judge**